UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

MICHELLE KHAN,

                    Plaintiff,

                                                    **MEMORANDUM & ORDER**
            v.                                      11-CV-5118 (MKB)

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                    Defendant.

--------------------------------------------------------------x

MARGO K. BRODIE, United States District Judge:

        Plaintiff Michelle Khan filed the above-captioned action seeking review pursuant to 42

U.S.C. § 405(g) of a final decision of Defendant Commissioner of Social Security denying her

application for disability insurance benefits.  Defendant moves for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the Commissioner's

decision is supported by substantial evidence and should be affirmed.  Plaintiff cross-moves for

judgment on the pleadings, arguing that Administrative Law Judge Margaret Pecoraro ("ALJ")

failed to satisfy her duties in several aspects:  (1) the ALJ did not correctly weigh the opinions of

Plaintiff's treating sources; (2) ALJ did not correctly assess Plaintiff's credibility; and (3) the

residual functional capacity determined by the Commissioner is not supported by substantial

evidence.  For the reasons set forth below, Defendant's motion for judgment on the pleadings is

denied.  Plaintiff's cross motion for judgment on the pleadings is granted.  The Commissioner's

decision is reversed and remanded for further proceedings.

## I. Background

Plaintiff was born in 1977. (R. at 87.) Plaintiff has a high school equivalency credential. (*Id.* at 44, 107.) She last worked in 2002 as a self-employed child care provider. (*Id.* at 43, 44, 104, 118.) Plaintiff lives with her son who is autistic. (*Id.* at 45.) Plaintiff currently receives public assistance and her son receives Supplemental Security Income.[1] (*Id.* at 53.) Plaintiff filed an application for disability insurance benefits on November 18, 2008, (*id.* at 87–90), because of her "depression, anxiety, back, neck problems, [and] schizophreni[a]" (*id.* at 103). According to Plaintiff, these conditions affected her ability to work because her "body hurts," she was "tired all the time," she "stay[ed] in the dark," she "stay[ed] in bed," and she had "a hard time focusing." (*Id.*) Plaintiff's application for disability benefits was denied. (*Id.* at 77.) On May 25, 2010, an administrative hearing was held before the ALJ. (*Id.* at 39–71.) At the hearing, Plaintiff and a vocational expert testified. (*Id.* at 38–71.) By decision dated August 9, 2010, the ALJ found that Plaintiff was not disabled. (*Id.* at 14–36.) The Appeals Council denied review of the ALJ decision on August 19, 2011. (*Id.* at 1–5.)

### a. Plaintiff's Testimony

At the ALJ hearing, Plaintiff testified that she has anxiety and depression. (R. at 47.) One cause of her depression is the death of her brother, which happened one year prior to the hearing before the ALJ. (*Id.*) Her very sick mother adds to her depression. (*Id.*) She has a difficult relationship with her father who is "kind of harsh" and does not "understand [her] son is autistic." (*Id.* at 48.) She has low self-esteem and is "not very social with people." (*Id.*) One of the reasons Plaintiff is not social and is depressed is because she gained weight and she believes

---

[1] Plaintiff claims that she is exempted from working while on welfare because of her condition. (R. at 69.)

people discuss her weight outside her presence.  (*Id*. at 48, 58.)  Because she is "anti-social," has difficulties concentrating and is forgetful, she would have a difficult time working.  (*Id*. at 62–63.)

Plaintiff has pain in her body and cannot "be active."  (*Id*. at 48.)  She feels severe pain in her lower back, neck, shoulder and foot.  (*Id*. at 55.)  She cannot walk for long distances, wash dishes, sit in place or stand for very long periods because of the pain.  (*Id*.)  In addition, she has heavy menstrual periods and bad cramps, which aggravate her back problems.  (*Id.* at 56.)  Some days Plaintiff is unable to take a shower because of the pain.  (*Id*. at 59.)  Plaintiff cannot sit due to back and leg pain and would have a difficult time working.  (*Id*. at 61.)

Plaintiff takes many medications, including Vicodin five times a week at night for the pain, Wellbutrin in the morning for depression, and Ambien and Klonopin for anxiety.  (*Id*. at 49–50.)  She takes Ambien every night and also takes Vicodin.  (*Id*. at 50.)  She only takes Klonopin when she needs it because it makes her tired.  (*Id.*)  Plaintiff estimated that she takes Klonopin three to four times a week.  (*Id*.)  She also uses "Tiger Balm."  (*Id.* at 55.)

Plaintiff's daily activities include giving her son breakfast, making sure he takes his medication, telling him which clothes to wear, making sure he has his school bag and has been to the bathroom, taking him to the bus stop and waiting with him.  (*Id*. at 50–51.)  Plaintiff also takes her son to doctor's appointments when necessary.  (*Id.* at 47.)  She is physically unable to cook for her son, but has had the assistance of a home health care aide for three years, Monday through Friday, for four hours in the evening and alternative weekends for eight hours, to help her with her son.  (*Id*. at 45, 51, 57.)  The aide does the grocery shopping and her son's laundry, but not Plaintiff's laundry, which is done by her laudromat.  (*Id*. at 56–57.)  Plaintiff also has a friend who helps her with her son.  (*Id*. at 46.)

After her son goes to school, Plaintiff takes Wellbutrin and attends to her bills.  (*Id*. at 51.)  If she is tired, Plaintiff lies down.  (*Id*.)  Plaintiff rarely performs household chores because she is unable to "bend."  (*Id*. at 52.)  Some days Plaintiff does not leave the apartment, mostly because she is caring for her son.  (*Id.* at 59.)  Plaintiff does not participate in any group activities but she does have some friends and one good friend.  (*Id.* at 60.)

Plaintiff spends her days attending various appointments, including welfare, medical doctor, psychiatrist and therapist.  (*Id*. at 69.)  Plaintiff meets with the therapist weekly.  (*Id.* at 52.)  Since March of 2007, Plaintiff has been seeking treatment at Woodside Mental Health Clinic, Catholic Charities ("the Woodside Clinic").  (*Id*. at 54.)  She was previously treated at St. Johns Clinic.  (*Id.*)  Plaintiff's prior therapist at Woodside Clinic was Julie Ann Moreno, who she saw for two years.  (*Id.*)  Her current therapist is Darcy Mentovia.  (*Id.*)  Plaintiff tries to keep a log of her appointments.  (*Id*. at 52.)  She has a difficult time remembering appointments and becomes overwhelmed and anxious so she has to write down her appointments.  (*Id.* at 63.)  Plaintiff gets to her appointments by either having her friend drive her or taking the bus.  (*Id.* at 52.)

### b. Plaintiff's Work History

Plaintiff last worked in 2002, as a self-employed child care provider for a family with three sons.  (R. at 43.)  She cared for the children in her home and the home of the children.  (*Id*.)  As a child care provider, she would bathe the children, help them with homework, prepare meals and monitor them during their recreational time.  (*Id.* at 43–44.)  This is Plaintiff's only significant employment.  (*Id.* at 65.)

### c. Vocational Expert's Testimony

The vocational expert testified that because of Plaintiff's limitations, Plaintiff would not be able to perform her prior work. (R. at 66, 68.) Assuming Plaintiff could concentrate, she could be an addresser or stamper, a toy stuffer, a sorter or a ticket checker. (*Id.* at 66–67.) Assuming Plaintiff could not concentrate, she also would not be able to perform any other job in the market. (*Id.* at 68.)

### d. Medical Evidence

#### i. Physical Conditions

##### 1. Nuzhat Faridi (Treating Physician)

Nuzhat Faridi, Doctor of Medicine ("M.D."), began treating Plaintiff in February 2008. (R. at 151, 470.) Dr. Faridi provided several reports and copious medical records from his treatment of Plaintiff. (*See generally id.* at 151–56, 202–07, 382–438, 459–519.) Dr. Faridi had in his records two MRIs from February 2008 — one of Plaintiff's cervical spine and one of her lumbar spine. (*Id.* at 202–04, 481–83.) The MRI of Plaintiff's cervical spine was normal. (*Id.* at 202, 483.) The MRI of Plaintiff's lumbar spine showed moderate disc bulging, which is a type of herniated disk. (*Id.* at 204, 482.) According to Dr. Faridi's records, Plaintiff suffered from neck, back, leg, feet, arm and shoulder pain. (*Id.* at 151, 399, 409, 413, 418, 422, 425.) Dr. Faridi prescribed Vicodin, Motrin, Naproxen, pain management and physical therapy for pain relief. (*Id.* at 392, 397, 405, 426, 428.) In a December 15, 2008 report, Dr. Faridi indicated that Plaintiff had a decreased range of motion due to pain. (*Id.* at 154.) However, he could not provide a medical opinion regarding Plaintiff's ability to perform work-related activities. (*Id.*)

On May 24, 2010, Dr. Faridi completed a physical residual functional capacity ("RFC") questionnaire. (*Id.* at 470). Dr. Faridi diagnosed Plaintiff with neck, back, leg, arm, foot and

shoulder pain.  (*Id.*)  Her signs and symptoms were the same as her diagnosis.  (*Id.*)  Plaintiff was taking Motrin, Naproxen and Vicodin for pain.  (*Id*. at 471.)  Dr. Faridi found Plaintiff's complaint of pain credible and found the basis for her pain to be her bulging disc and related narrowing in the spinal canal.  (*Id*. at 472.)  Dr. Faridi noted that Plaintiff must lie down during the day due to neck and back pain but failed to provide any further information regarding Plaintiff's need to lie down.  (*Id*. at 472.)  Dr. Faridi opined that Plaintiff was not able to perform work that requires standing or walking for a significant part of an eight-hour workday, i.e., two-thirds or more, because of leg, back and neck pain.  (*Id*. at 473.)  Dr. Faridi wrote "N/A" in response to the question inquiring whether Plaintiff is able to perform a job that required sitting for most of an eight-hour workday, meaning six to eight hours.  (*Id*.)  However, in response to the next question which asked for a reason "why the patient cannot sit for 2/3 or more of an 8-hour workday," Dr. Faridi listed neck and back pain.  (*Id.*)  Dr. Faridi did not indicate how many hours Plaintiff could sit in an eight-hour workday.  (*Id.*)

Dr. Faridi noted that Plaintiff had several other limitations.  Plaintiff was limited in her ability to lift and carry weight and bend and stoop because of her bulging disk and back pain. (*Id.* at 474, 475.)  Dr. Faridi also noted that Plaintiff was limited in the use of her hands for activities such as reaching, handling, fingering or feeling.  (*Id*.)  Plaintiff could not use her right hand or left hand for repetitive, simple grasping or her right arm or left arm for repetitive pushing and pulling because of pain.  (*Id.*)  Dr. Faridi found that Plaintiff's pain also limited her ability to (1) maintain attention and concentration for extended periods of time, e.g., two-hour periods, (2) perform work tasks at a consistent pace without an unreasonable number and length of rest periods, and (3) maintain regular attendance and be punctual within customary tolerance.  (*Id*. at 479.)

### 2. Louis Tranese (Consultative Orthopedic Examiner)

Louis Tranese, Doctor of Osteopathic Medicine ("D.O."), a consultative orthopedic examiner, saw Plaintiff on January 9, 2009 on behalf of the Social Security Administration ("SSA"). Dr. Tranese noted that Plaintiff claimed she had a "10 to 12 year history of low back pain" and was diagnosed with a disk bulge. (R. at 157.) Plaintiff had received therapy for the pain but was not in therapy at the time of the examination. (*Id.*) Plaintiff described her pain as a "localized, dull, crampy, stiff ache which is generally located in the lower lumbar region and [was] graded" seven out of ten, but she had no radiation of pain to her legs or numbness, tingling or weakness of the lower extremities. (*Id.*) Plaintiff's back pain was aggravated by sudden movements, heavy lifting, frequent bending, lying on her back and sitting or standing for long periods. (*Id.*) "Her pain [was] relieved with position changes and anti-inflammatory medications." (*Id.*) Plaintiff independently cooked, cleaned, did laundry, shopped, showered, bathed, dressed and groomed herself. (*Id.* at 158.)

Dr. Tranese noted that Plaintiff appeared to be "in no acute distress." (*Id.*) Her gait was normal. (*Id.*) Plaintiff was able to walk "on her heels and toes without difficulty, but declined to squat greater than 25% maximum capacity as she reported pain." (*Id.*) Plaintiff had a cane but in Dr. Tranese's opinion, it was "not medically necessary," it "was not used for the entire evaluation," and her gait was unchanged with or without the cane. (*Id.*) Plaintiff needed "no help changing for the exam or getting on and off the exam table," and she was able to rise from the chair without difficulty. (*Id.*)

Plaintiff's hand and finger dexterity were intact, and she had "full flexion, extension," movement and no pain or spasms in her lumbar, thoracic and cervical spines. (*Id.* at 158–59.) Plaintiff's rotary movements in the thoracic and lumbar spines were limited to approximately 15

to 20 degrees bilaterally due to obesity. (*Id.*) Plaintiff reported bilateral tenderness in her lumbar spine. (*Id.*) However, Dr. Tranese noted that the x-ray of Plaintiff's lumbar spine showed no abnormality. (*Id*. at 159.) Plaintiff had full range of motion of her shoulders, elbows, forearms, wrists, fingers, hips, knees and ankles. (*Id.* at 158.) Plaintiff had no joint inflammation, effusion, instability, muscle atrophy or sensory abnormality in her extremities. (*Id.* at 158–59.) In her extremities, her strength was normal and her reflexes were physiologic and equal. (*Id.*)

Dr. Tranese diagnosed Plaintiff with chronic lower back pain and his prognosis was fair to good. (*Id.*) He found that Plaintiff "may have mild to moderate limitations with heavy lifting and frequent bending and mild limitations with standing long periods and walking long distances." (*Id.*) However, she had "no other physical functional deficits." (*Id.*)

### 3. Victoria Karlinsky-Bellini (Consultative Orthopedic Examiner)

Victoria Karlinsky Bellini, M.D., a consultative orthopedic examiner, saw Plaintiff on March 31, 2010. (R. at 366–75.) Plaintiff complained of right knee pain as measuring an eight of ten in intensity and "dull and achy in its character." (*Id.* at 366.) She had not been to a doctor about the pain, but the pain occurred if "she stands or walks for prolonged periods of time." (*Id.*) Plaintiff cooked "two to three times a week, when the pain [did] not bother her." (*Id.*) She showered, dressed herself, did laundry and shopped as needed. (*Id.*) She was not able to take care of her child because "she is not fit for it." (*Id.*)

Dr. Karlinsky-Bellini noted that Plaintiff's gait was normal. (*Id.*at 367.) However, Plaintiff was unable to walk on her heels or toes or squat due to pain in her knee. (*Id.*) She needed no help changing for the examination or getting on and off the examination table and rose from the chair without difficulty. (*Id*.) Plaintiff's hand and finger dexterity were "intact" and her grip strength was normal. (*Id.*) Plaintiff had "full flexion, extension" and movement of her

cervical, thoracic and lumbar spines and no pain, spasms, or tenderness in these areas. (*Id.*)

Plaintiff had full range of motion of shoulders, elbows, forearms, wrists, fingers, hips and ankles,

but movement in her right knee was limited to 90 degrees due to pain. (*Id.*) Plaintiff had no

joint inflammation, effusion, instability, muscle atrophy or sensory abnormality in her

extremities and her strength and reflexes were normal. (*Id.* at 367–68.)

Dr. Karlinsky-Bellini diagnosed Plaintiff with right knee pain. (*Id.*) However, Dr.

Karlinsky-Bellini noted that no "workup" was available for the knee pain diagnosis. (*Id.*) She

also stated that Plaintiff had "mental problems, as per history." (*Id.*) Dr. Karlinsky-Bellini

opined that sitting, pushing, pulling, lifting, bending and reaching were unrestricted. (*Id.*)

"Standing, walking, and climbing [were] mildly . . . to moderately limited due to right knee

pain." (*Id.*) Plaintiff could occasionally lift and carry up to ten pounds. (*Id.* at 369.) Plaintiff

could sit for two hours, stand for thirty minutes and walk for thirty minutes without interruption,

and could generally sit for four hours, stand for two hours and walk for two hours in an eight-

hour day. (*Id*. at 370.) Plaintiff did not need a cane to walk. (*Id*.) Plaintiff could occasionally

use her hands for reaching, handling, fingering, feeling, pushing and feeling. (*Id*. at 371–72.)

She could operate foot controls and perform postural activities. (*Id.*)

### 4. Tahmina Sikder (Consultative Internal Medicine Examiner)

Tamina Sikder, M.D., performed a consultative internal medicine examination of Plaintiff

on April 8, 2010. (R. at 484–94.) Plaintiff reported a "history of depression" and back pain. (*Id*.

at 484.) Plaintiff also reported that she had difficulty walking a block and lifting heavy items.

(*Id.* at 485.) Plaintiff suffered from shortness of breath and tired very easily. (*Id.*) She cooked

two to three times a week and cleaned once a week. (*Id.*) Plaintiff did laundry, but used a

delivery system for shopping. (*Id.*) Plaintiff showered every other day and dressed herself daily. (*Id.*) Plaintiff attended doctor's appointments and socialized with friends. (*Id.*)

Dr. Sikder made several observations. Dr. Skider noted that Plaintiff was obese and walked with a cane. (*Id.*) However, Plaintiff "appeared to be in no acute distress" and her gait and stance were normal. (*Id.*) Plaintiff was unable to walk on her heels, but she was able to walk on her toes. (*Id.*) Plaintiff complained of back stiffness and pain. (*Id.*) She was able to "[s]quat up to 1/4." (*Id.*) Plaintiff "[u]sed a cane off and on for walking because of pain . . . as well as for fatigue." (*Id.*) However, Plaintiff "[n]eeded no help changing for [the] exam or getting on and off [the] exam table [and she was] [a]ble to rise from chair without difficulty." (*Id.*)

Plaintiff had "full flexion, extension" and movement in her cervical spine. (*Id.* at 486.) She had no abnormality in her thoracic spine. (*Id.*) Her lumbar spine was limited to 50 degrees in forward bending and her "lateral flexion and LS rotation limited to 10 degrees," which was "most likely secondary to her obesity as well as [her] pain." (*Id.*) Plaintiff had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees and ankles. (*Id.*) However, "[h]ip movement elicited [Plaintiff's] back pain." (*Id.*) Plaintiff had normal strength in her extremities. (*Id.*) Her joints were stable and were not tender. (*Id.*) In addition, there was no redness, heat, swelling or effusion of the joints. (*Id.*) There was no muscle atrophy in the extremities. (*Id.* at 487.) Plaintiff's hand and finger dexterity were intact and her grip strength was normal. (*Id.*)

Dr. Sikder diagnosed Plaintiff with depression, back pain and obesity. (*Id.*) Dr. Skider determined that her prognosis was stable. (*Id.*) Plaintiff was "mild to moderately limited in prolonged walking, climbing, squatting, bending, lifting, and carrying secondary to her back pain as well as secondary to her obesity." (*Id.*) Plaintiff could occasionally lift up to 20 pounds and

carry up to 10 pounds.  (*Id*. at 488.)  Plaintiff could sit six hours, stand two hours and walk two

hours without interruption in an eight-hour work day.  (*Id*. at 489.)  Plaintiff could walk half a

block without a cane.  (*Id*.)  Plaintiff could frequently use her hands and feet.  (*Id*. at 490.)

Plaintiff could never balance or climb ladders or scaffolds.  (*Id*. at 491.)  Plaintiff could

occasionally climb stairs and ramps, stoop, kneel, crouch and crawl.  (*Id*.)  Plaintiff could never

tolerate unprotected heights.  (*Id*. at 492.)  Plaintiff could perform daily life activities and no

work related activities would be affected by her impairments.  (*Id*. at 493.)

### 5.  Physical RFC Assessment

The RFC assessment, which is based on the evidence in Plaintiff's file, diagnosed

Plaintiff with "chronic low back pain."  (R. at 190–95.)  The RFC assessment noted that Plaintiff

could occasionally lift and/or carry 50 pounds and frequently lift 25 pounds.  (*Id.* at 191.)

Plaintiff could stand and/or walk six hours in an eight hour work day.  (*Id.*)  Plaintiff could sit for

about six hours in an eight hour work day.  (*Id.*)  Plaintiff had an unlimited ability to push and/or

pull.  (*Id.*)  These conclusions were based on Plaintiff's diagnosis of chronic low back pain

coupled with her full flexion and extension in her lumbar spine, along with her negative lumbar

spine x-ray.  (*Id.*)  The RFC assessment found no postural, manipulative, visual, communicative

or environmental limitations.  (*Id.* at 192–93.)  The RFC assessment did not include a credibility

assessment because while Plaintiff stated that her symptom was back pain, she did not describe

how the symptoms limited her functioning.  (*Id.* at 193.)

### ii. Psychiatric Conditions

#### 1. Nadar Galal and Darcy Mentovia (Treating Psychiatrist and Treating Therapist)

Nadar Galal, M.D., and Darcy Mentovia, Licensed Master Social Worker ("LMSW"), submitted a RFC questionnaire to the ALJ.[2] Plaintiff first began to receive treatment at the Woodside Clinic on March 15, 2007, but was terminated from the program on or about June 11, 2009 for failing to attend appointments. (*See id.* at 275, 510.) Plaintiff was readmitted to the Woodside Clinic on January 26, 2010. (*Id.*) According to Dr. Galal and Mentovia, they met with Plaintiff weekly for therapy sessions and monthly for medication management. (*Id*. at 510.) Plaintiff was diagnosed with major depressive disorder and a global assessment functioning ("GAF") of 60.[3] (*Id.*) They found that Plaintiff had no limitation in activities of daily living. (*Id.* at 511.) Plaintiff had moderate limitation in social functioning due to her "[a]nxious mood, difficulty initiating contact with others," "[d]epressed mood [which] cause[d] anhedonia (loss of interest in activities)" and her "poor self esteem." (*Id.*) Plaintiff also had mild limitation in "[c]oncentration, persistence and pace." (*Id*. at 512.)

Dr. Galal and Mentovia made certain determinations and reached certain conclusions. They determined that Plaintiff would "experience deterioration or decompensation in a work or

---

[2] When initially submitted, the RFC questionnaire only contained Mentovia's signature. (*See* R. at 468.) At the hearing on May 25, 2010, Plaintiff's counsel informed the ALJ that the doctor had not been at the clinic to sign the questionnaire and the ALJ gave Plaintiff a week to submit a new questionnaire with the psychiatrist's signature. (*Id.* at 70.) Dr. Galal signed the questionnaire on June 3, 2010, and it appears Plaintiff submitted the updated questionnaire to the ALJ on or about June 30, 2010. (*See id.* at 495, 519.)

[3] "A GAF scale from 0 to 100 may be used to report the clinician's judgment of the individual's overall symptom severity and level of functioning. A GAF of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning." *Avila v. Astrue*, No. 11-CV-9048, 2013 WL 1241925, at *5 n.4 (S.D.N.Y. Mar. 28, 2013) (citing Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) ("DSM–IV–TR")).

work-like setting resulting in Plaintiff withdrawing from that situation or experiencing exacerbation of psychiatric signs or symptoms." (*Id.*) Their belief was based on Plaintiff's inability to retain employment which Plaintiff "attributed to mood, anxiety and psychosocial stresses in her life." (*Id.*) They opined that Plaintiff could not complete a normal workday and workweek without interruptions from psychologically based symptoms because of grief over her brother's death, her depression and her poor self-esteem. (*Id.* at 516.) Plaintiff could not perform at a consistent pace without an unreasonable number and length of rest periods because of her obesity and grief. (*Id.* at 517.) Plaintiff could not accept instructions and respond appropriately to criticisms from supervisors because her poor self-esteem might exacerbate her condition when being criticized by supervisors. (*Id.*) Additionally, Plaintiff could not respond appropriately to changes in a routine work setting and might need more time to adjust to changes due to her psychiatric condition.[4] (*Id.* at 518.)

### 2. Haruyo Fujiwaki (Consultative Psychological Examiner)

Haruyo Fujiwaki, Doctor of Philosophy ("Ph.D."), performed a consultative psychological examination of Plaintiff on February 17, 2009. (R. at 164–67.) Plaintiff told Dr. Fujiwaki that she had been seeing a psychiatrist once per month and a therapist two times per week since 2007 at Woodside Clinic. (*Id.*) Plaintiff reported difficulty sleeping, an increased appetite, gaining fifty pounds in a few years, panic attacks and palpitations. (*Id.* at 164–65.)

---

[4] Dr. Galal and Mentovia found, however, that Plaintiff could remember locations, work-like procedures and very short and simple instructions. (R. at 513–14.) She could also maintain concentration and attention for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain ordinary routine without special supervision, work in coordination with, or proximity to, others without being unduly distracted by them, make simple work-related decisions, be aware of normal hazards and take appropriate precautions, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes and interact appropriately with the public. (*Id*. at 513–18.)

Plaintiff told Dr. Fujiwaki that she had "mood changes because she worrie[d] a lot." (*Id.*) Plaintiff worried about her husband who had trouble with the law and her mother who was recently placed in a nursing home. (*Id.*) "Her depressive symptoms include[d] crying spells and fatigue." (*Id.*) Plaintiff denied "manic and psychotic symptoms." (*Id.*) Plaintiff was able to "dress, bathe, and groom herself; however, sometimes it [was] difficult to bathe due to physical pain." (*Id*. at 166) Plaintiff sometimes cooked and cleaned. (*Id.*) Plaintiff used a laundry service because of pain. (*Id.*) She also used a delivery service for food shopping. (*Id.*) Plaintiff could manage money. (*Id.*) Plaintiff would take the bus. (*Id.*) Plaintiff had some friends with whom she could talk. (*Id.*) Plaintiff reported a close relationship with her 13-year old son and a distant relationship with her 10-year old son. (*Id.*)

Dr. Fujiwaki noted that Plaintiff's "[d]emeanor and responsiveness to questions was cooperative," and her "[m]anner of relating, social skills, and overall presentation was adequate." (*Id.* at 165.) Plaintiff was "adequately groomed." (*Id*.) She used a cane and her gait was poor. (*Id.*) Her eye contact was appropriately focused. (*Id.*) Plaintiff's speech was intelligent and her language skills were adequate. (*Id.*) Her thought processes "were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia." (*Id.*) Her affect was "full range and appropriate in speech and thought content." (*Id.*) Plaintiff's mood was neutral. (*Id.*) Plaintiff "was oriented to person, place, and time." (*Id*.) Plaintiff's attention and concentration were intact, and she was able to "perform serial 3s," which involves counting downward by threes. (*Id*. at 166.) Her recent and remote memory skills "were mildly impaired." (*Id.*) Plaintiff was able to recall the names of three objects immediately and after five minutes. (*Id.*) She could repeat five digits forward and three digits backward. (*Id.*) Plaintiff's "[i]ntellectual functioning

appeared to be average," and her "[g]eneral fund of information was appropriate with experience." (*Id.*) Her insight and judgment were fair. (*Id.*)

Dr. Fujiwaki opined that Plaintiff was "able to follow and understand simple directions and instructions," "perform simple tasks independently," "maintain attention and concentration," make some simple decisions, "relate with others" and "manage her own funds." (*Id.*) "She [wa]s able to maintain a regular schedule with some difficulty due to emotional distress secondary to physical pain." (*Id.*) "She [could] learn new tasks with extended time." (*Id.*) She could perform complex tasks but needed supervision. (*Id.*) Dr. Fujiwaki opined further that Plaintiff might "have some difficulty dealing with stress due to physical pain." (*Id.*) Dr. Fujiwaki diagnosed Plaintiff with depressive disorder and anxiety disorder and recommended that Plaintiff "continue with psychological and psychiatric treatment as currently provided." (*Id.* at 167.) His prognosis for Plaintiff was fair.[5] (*Id.*)

### 3. Michael Alexander (Consultative Psychological Examiner)

Michael Alexander, Ph.D., performed a consultative psychological examination of Plaintiff on March 31, 2010. Plaintiff reported that she slept normally while taking her medication but had an increase in her appetite. (R. at 359.) Plaintiff reported "a history since 2007 of dysphoric mood, intermittent crying spells, and fatigue." (*Id.*) She denied social and homicidal ideas but reported "a tendency to worry a lot." (*Id.*) Dr. Alexander noted that "[t]here [wa]s no evidence of panic or manic related symptoms, a thought disorder, or cognitive deficit." (*Id.* at 360.) Plaintiff reported that she was able to "dress, bathe, and groom herself" and do "light" cooking, cleaning and shopping. (*Id.* at 361.) Plaintiff managed her own money and took

---

[5] Dr. Fujiwaki also noted that Plaintiff had "pain in neck, back, feet, hands, and shoulders" and was obese. (R. at 167.)

public transportation independently. (*Id.*) She also reported having few close friends but having a distant relationship with her family. (*Id.*)

Dr. Alexander opined that Plaintiff "presented as a cooperative, friendly, and alert female. Her manner of relating and social skills were adequate." (*Id*. at 360.) Plaintiff was well groomed and her posture and motor behavior were normal. (*Id.*) Her speech was "express" and "adequate for normal conversation" and her thought processes were "coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the examination." (*Id.*) Her affect was "full range and appropriate in speech and thought content" and her mood was neutral. (*Id.*) Her attention, concentration, recent and remote memory skills were intact. (*Id.* at 361.) Her insight and judgment were adequate. (*Id*.) Dr. Alexander concluded that Plaintiff's cognitive functioning was average. (*Id.*)

Dr. Alexander found that Plaintiff could "follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, and maintain a regular schedule." (*Id.*) Plaintiff reported that she had "difficulty performing some complex tasks independently, not due to psychological factors, but due to her stated medical condition." (*Id.*) He found that Plaintiff could "make appropriate decisions, relate adequately with others, and appropriately deal with stress." (*Id*.) Dr. Alexander concluded that "[t]he result of the examination appear to be consistent with psychiatric problems which do not appear significant enough to interfere with the claimant's ability to function on a daily basis." (*Id*.) Dr. Alexander found that that Plaintiff's "ability to understand, remember, and carry out instructions" would not be affected by the impairment. (*Id*. at 363.) Plaintiff's "ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine work setting" would not be affected by the impairment. (*Id*. at 364.) He diagnosed Plaintiff with depressive

disorder, headaches, obesity and neck, knee and shoulder pain with a good prognosis. (*Id.* at

362.) He recommended that Plaintiff "[c]ontinue with psychiatric treatment as provided." (*Id.*)

### 4. Mental RFC Assessment

Plaintiff's mental RFC assessment listed Plaintiff's medically determinable impairments

as depressive disorder and anxiety disorder. (*Id.* at 173, 175.) Plaintiff's daily living activities

were mildly restricted. (*Id.* at 180). Plaintiff had no difficulties in maintaining "[s]ocial

[f]unctioning," "[c]oncentration, [p]ersistence or [p]ace." (*Id.*) Plaintiff had not experienced

repeated extended episodes of deterioration. (*Id.*) The evidence in the record did not establish

"C" criteria.[6] (*Id.* at 181.) Plaintiff's psychiatric history did "not support marked psychiatric-

related functional limitations" because Plaintiff was "not suicidal or psychotic; ha[d] had no

acute psychiatric episodes; [wa]s cognitively intact; [and] [wa]s able to perform [activities of

daily life] from a psychiatric perspective." (*Id*. at 182.) Thus, Plaintiff "would be able to

perform the basic requirements of simple work." (*Id.*)

---

[6] "C" criteria is "[m]edically documented history of a chronic organic mental (12.02), schizophrenic, etc. (12.03), or affective (12.04) disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration. 2. A residual disease that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." (R. at 181.)

### 5. Other Medical Evidence[7]

Plaintiff began psychiatric treatment at Woodside Clinic in March 2007. A "Psychosocial Assessment" was performed on March 15, 2007.[8] (R. at 217–220; 455–58.) Plaintiff presented with "symptoms of depression, feelings of distress, and inability to adapt to her surroundings and present lifestyle." (*Id.* at 217, 455.) Plaintiff stated that she had low energy and low self-esteem. (*Id.* at 217, 455.) She was on Wellbutrin. (*Id.* at 220, 458.) Plaintiff's December 18, 2007 "Treatment Plan Review" shows that she attended bi-weekly therapy sessions and monthly medication management sessions and that the course of treatment would continue until Plaintiff's symptoms of depression significantly decreased. (*Id.* at 271–72.)

Plaintiff continued to seek treatment in 2008. In a "Comprehensive Treatment Plan" dated March 18, 2008, Plaintiff's diagnosis was "major depression with psychotic features." (*Id.* at 269.) She was on Wellbutrin and in individual therapy bi-weekly and psychopharmacology meetings once a month. (*Id.* at 269–70.) In a "Psychosocial Update" dated March 26, 2008, Plaintiff reported "low energy," "conflicts with her obesity" and low self-esteem. (*Id.* at 216.) Her "mood was neutral and affect was congruent with her mood." (*Id.*) Plaintiff was seeing Dr. Partyka, and she was taking Wellbutrin. (*Id.*) In the "Mental Status Exam" dated March 26, 2008, Plaintiff's thought process included "delusions" and Plaintiff was diagnosed with major depressive disorder with psychotic features. (*Id.* at 258–60.) Plaintiff also had difficulty with memory and concentration. (*Id.*) She was able to remember only two out of three objects and

---

[7] In addition to the consultative reports and RFC questionnaire submitted by Dr. Galal and Mentovia's RFC questionnaire, the ALJ had contemporaneous treatment reports from the Woodside Clinic that span the period of Plaintiff's treatment at the clinic as well as a document of unknown origin that is labeled "F.E.G.S."

[8] Plaintiff's treatment plans and updates appear to have been prepared every three months by various therapists at the Woodside Clinic.

she was unable to do serial sevens, counting backward by sevens. (*Id.*) According to Plaintiff's "Treatment Plan Reviews" dated June 18, 2008, September 17, 2008 and December 17, 2008, Plaintiff continued to be treated with medication, therapy bi-weekly and psychopharmacology meetings monthly. (*Id.* at 265–70.)

Plaintiff continued to seek treatment at Woodside Clinic in 2009. In a "Fact Sheet," dated March 10, 2009, Plaintiff's diagnosis was "major depression with psychotic features." (*Id.* at 243.) In a "Mental Status Exam" dated March 25, 2009, Plaintiff had problems with concentration and performing her serial sevens. (*Id.* at 255–57.) She was also depressed, anxious and had difficulty sleeping. (*Id.*) Plaintiff did not, however, have any delusions. (*Id.*) According to Plaintiff's March 17, 2009 "Treatment Plan Review," Plaintiff continued her therapy sessions and was taking Wellbutrin, Vistrail and Buspar. (*Id.* at 261–62.) Some of Plaintiff's treatment plans warned of certain dangers if Plaintiff discontinued treatment. For example, her March 17, 2009 "Treatment Plan Review" stated: "Failure to provide treatment could result in an exacerbation of client's above symptoms, psychiatric decompensation, danger to self, or others and subsequent psychiatric hospitalization." (*Id.*)

There are also various case notes and other forms documenting Plaintiff's discussions with therapists in and out of therapy sessions. These documents illustrate that Plaintiff had days of improvement and days where she continued to report anxiety and depression. (*Id.* at 215, 251, 275–356.) These notes also demonstrate that Plaintiff had a problem with attending therapy sessions, which eventually resulted in her being dismissed from the Woodside Clinic program on or about June 11, 2009. (*Id.* at 275; *see also id.* at 282–85, 287, 296, 300, 302–03, 305, 314, 317–18, 322, 325, 337, 340–41, 344–45, 347, 353.)

Plaintiff was readmitted into the Woodside Clinic program in early 2010. In a Psychosocial Evaluation dated January 26, 2010, Plaintiff reported experiencing "depressed mood, fatigue, feelings of worthlessness and low self-esteem, lack of motivation and tearfulness." (*Id.* at 210.) Plaintiff also reported bereavement issues but denied suicide, psychotic symptoms and hallucinations. (*Id.*) Plaintiff's mood was depressed and "her affect was congruent to her mood." (*Id.*) She was "dressed and groomed appropriately." (*Id.*) Her "judgment and insight [were] fair." (*Id.*) Plaintiff's "[activities of daily living] appear[ed] to be within normal limits." (*Id.*) During a February 4, 2010 "Mental Status Exam," Plaintiff reported symptoms of depression, which included "sadness, tearfulness, [and] low energy." (*Id.* at 224–26.) The February 11, 2010 "Initial Treatment Plan" lists Plaintiff's diagnosis as "moderate" "Major Depressive" disorder with a GAF score of 58. (*Id.* at 228.) Plaintiff was prescribed individual therapy weekly and psychopharmacology monthly. (*Id.*) The February 11, 2010 Plan warned that if Plaintiff is not treated, she may need hospitalization and that treatment will end when Plaintiff "is able to manage depressive [symptoms] for at least a year." (*Id.* at 229.) In the February 25, 2010 "Mental Status Exam," it was noted that Plaintiff had difficulties with serial sevens and presented with "recurrent depressive symptoms." (*Id.* at 221–23.) However, Plaintiff's prognosis was fair. (*Id.*) In 2010, Plaintiff continued to report anxiety and depression. (*Id.* at 227, 232–38.)

In addition to the documents from Woodside Clinic, there is an "F.E.G.S. Biopsychosocial Summary" which was compiled on February 12, 2010.[9] (*Id*. at 520–47.) On

---

[9] Plaintiff does not describe the nature of this document nor is it developed in the record or in the ALJ's opinion. Through its own research, the Court is aware that there is an organization called "FEGS" that provides "not-for-profit health and human services." *See About FEGS*, http://www.fegs.org/about/about_fegs (last visited July 9, 2013). However, the record is

the depressive screen Plaintiff scored 17 on the PHQ-9, which indicates moderately severe major depression.  (*Id.*; Pl. Cross Mot. 9.)

### e.  The ALJ's Decision

The ALJ conducted the five-step sequential analysis.  First, the ALJ found that Plaintiff had not engaged in substantial activity since November 12, 2008, the application date.  (R. at 16.)  Second, the ALJ found that Plaintiff had the following severe impairments:  moderate major depressive disorder, lumbar disc bulge and obesity.  (*Id.*)  The ALJ determined that these impairments "cause more than minimal limitation in [Plaintiff's] ability to perform basic work activity and therefore are severe."  (*Id.*)  Third, the ALJ found that Plaintiff did not have an impairment that is listed in Appendix 1 of the regulations.  (*Id.* at 16–19, 23.)  The ALJ specifically considered Listing 12.04 for depression and Section 1.00 for disc bulge and pain, along with Social Security Ruling ("SSR") 02-1p for obesity.  (*Id.* at 16–18.)  Regarding Listing 12.04, the ALJ found that Plaintiff's depression did not restrict her daily living activities because Plaintiff was generally able to care for her home, her finances and her autistic son.  (*Id.*)  The ALJ found that Plaintiff only had moderate difficulties in social functioning because Plaintiff had some friendships.  (*Id.*)  The ALJ found that Plaintiff had "mild difficulties in concentration, persistence, or pace."  (*Id.*)

Fourth, the ALJ found that Plaintiff had "the residual functional capacity to perform sedentary work . . . ."  (*Id*. at 19.)  The ALJ found that Plaintiff could "lift/carry ten pounds; sit for six hours; and stand/walk for two hours in an eight hour workday, though she is limited to occasional stooping."  (*Id*.)  The ALJ also found "[n]o non-exertional limitations significantly

---

unclear concerning what, if any, association there is between this organization and Plaintiff's report.

erode [Plaintiff's] residual capacity." (*Id*.) Plaintiff was "able to understand, remember, and carry out simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being unduly distracted, make simple work related decisions, be aware of normal hazards and take appropriate precaution, and interact appropriately with the public." (*Id*.)

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's ] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible." (*Id*. at 29–30.) The ALJ found that "[t]he medical records simply fail[ed] to confirm the accuracy of the claimant's assertions and hearing testimony." (*Id*. at 30.) In evaluating Plaintiff's physical impairments, the ALJ gave great weight to the opinions of Dr. Tranese, Dr. Karlinsky-Bellini and Dr. Sikder, who performed consultative examinations of Plaintiff's physical impairments. (*Id*. at 32.) The ALJ gave the opinion of Dr. Faridi, the treating physician, little weight because "his opinions are simply unsupported by any clinical findings, and inconsistent with the evidence as a whole." (*Id*.) The ALJ noted that many of Dr. Fairdi's diagnoses appeared to be based on "claimant's own reports." (*Id*. at 32–33.)

As to Plaintiff's mental impairments, the ALJ found that "the treating records continuously indicate that Plaintiff was stable, with fair insight and judgment, no hallucinations or delusions, and no suicidal or homicidal ideation, and even when her mood was anxious, her affect has been full range and her thought processes organized." (*Id*. at 30) The ALJ noted that Plaintiff's "medical treatment has been conservative," she had never "been hospitalized for her

impairments," and her medication appeared to have been effective without adverse side effects. (*Id*. at 31.)  In addition, the ALJ noted that "the record indicates that the claimant engages in a reasonably broad range of daily living activities."  (*Id*.)

In evaluating Plaintiff's mental impairments, the ALJ reviewed the RFC questionnaire from Dr. Galal and Mentovia, the consultative report of Dr. Fujiwaki, the consultative report of Dr. Alexander, Plaintiff's RFC assessment, Plaintiff's records from the Woodside Clinic which contained regular treatment reports by Plaintiff's various therapists and Plaintiff's record labeled F.E.G.S.  Of Plaintiff's regular treatment reports, the ALJ selectively discussed the reports by JulieAnn Moreno,[10] a Licensed Clinical Social Worker ("LCSW"), and Jessica Flint,[11] a LMSW.[12]

The ALJ gave great weight to Dr. Fujiwaki and Dr. Alexander.  (*Id*. at 33.)  The ALJ stated that Moreno was "a treating source."  (*Id*.)  She gave significant weight to Moreno's opinion that Plaintiff's "activity of daily living skills are within normal limits," but she gave "little weight" to Moreno's analysis of Plaintiff's GAF scores.[13]  (*Id*.)  She gave some weight to the mental RFC assessment.  (*Id*.)  The ALJ gave little weight to the opinion of Mentovia

---

[10]  The ALJ refers to Moreno as a doctor.  (R. at 33).  However, according to Plaintiff's medical records, Moreno is a LCSW and Certified Alcohol and Substance Abuse Counselor or Credentialed Alcoholism and Substance Abuse Counselor ("CASAC"), not a M.D. or a Ph.D. (*Id.* at 144–50).

[11]  The ALJ mistakenly refers to Jessica Flint as a doctor. (R. at 33.)  However, she is not a M.D. or a Ph.D. but a LMSW.  (*See id.* at 208.)

[12]  In addition to JulieAnn Moreno and Jessica Flint, there are records from Dr. Marta Partyka, Vera Osipyan, LMSW, Marin Soren, LMSW and John Croner, LMSW. (*See* R. at 210–15, 238–39, 243, 251, 255–57, 261–62, 275–97, 299–300, 304, 309, 311, 323, 327, 330, 333, 337, 342.)

[13]  She also gave little weight to Flint's opinion regarding Plaintiff's GAF score.  (R. at 30.)

because "she is a licensed social worker rather than a medical doctor, and further, her opinions of severe limitations are not consistent with the evidence as a whole and are not supported by clinical findings." (*Id.*) It appears that the ALJ did not treat the RFC questionnaire prepared by Dr. Galal and Mentovia as submitted by Dr. Galal and only referred to Mentovia when discussing the questionnaire. (*Id.*)

The ALJ found that Plaintiff could not perform her past relevant work as a child monitor given Plaintiff's mobility limitations. (*Id.* at 34.) The ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform," including unskilled sedentary work which includes "addresser/stamper," "toy stuffer," "sorter" and "paramutual ticket taker." (*Id.* at 35.) The ALJ concluded that "[b]ased on the residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'non-disabled' is warranted within the framework of Medical-Vocational Rule 201.28." (*Id.*)

## II. Discussion

### a. Standard of Review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Substantial evidence requires "more than a mere scintilla." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). Once an ALJ finds facts, the

court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*."

*Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations and

internal quotation marks omitted).  In deciding whether substantial evidence exists, the court

"defer[s] to the Commissioner's resolution of conflicting evidence."  *Cage v. Comm'r of Soc.*

*Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  The Commissioner's factual findings "must be given

conclusive effect so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606

F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).

If, however, the Commissioner's decision is not supported by substantial evidence or is

based on legal error, a court may set aside the decision of the Commissioner.  *McCall v. Astrue*,

No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008); *see Balsamo v. Chater*,

142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that

'[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is

inclusion rather than exclusion.'"  *McCall*, 2008 WL 5378121, at *8 (quoting *Rivera v.*

*Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b.  Availability of Benefits

Federal disability insurance benefits are available to individuals who are "disabled"

within the meaning of the Social Security Act (the "Act").  To be eligible for disability benefits

under the Act, the plaintiff must establish his or her inability "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such

severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The Commissioner has promulgated

a five-step analysis for evaluating disability claims.  20 C.F.R. § 404.1520.  The Second Circuit

has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed.  If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work.  If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the [Commissioner] will find the claimant disabled.  However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work.  Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.  If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d

Cir. 1996)).

### c.  Analysis

Defendant moves for judgment on the pleadings, arguing that the Commissioner's

decision is supported by substantial evidence in the record.  (Def. Mem. 1.)  Plaintiff cross-

moves for judgment on the pleadings, arguing that reversal is proper based on the following legal

errors: (1) the ALJ did not correctly weigh the opinions of Plaintiff's treating sources; (2) the

ALJ did not correctly assess Plaintiff's credibility; and (3) the residual functional capacity

determined by the Commissioner is not supported by substantial evidence.  (Pl. Cross Mot. 15–

21.)

### i. Duty to Develop the Record and Treating Physician Rule

Plaintiff argues that the ALJ erred in failing to give sufficient weight to the opinion of Dr. Faridi and Dr. Galal, Plaintiff's treating physicians. (Pl. Cross Mot. 16–17.) "A treating physician's statement that the claimant is disabled cannot itself be determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). But a treating physician's opinion on the "nature and severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (summary order) (discussing treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) (per curiam)); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (discussing treating physician rule). A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

An ALJ must consider various factors before determining how much weight to give a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion;

(3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129); *see also Halloran*, 362 F.3d at 32 (discussing the factors). The regulations require that the ALJ set forth the reasons for the weight he or she assigns to the treating physician's opinion. *Halloran*, 362 F.3d 32. The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (summary order); *see also Halloran*, 362 F.3d at 32–33.

Before determining whether the Commissioner's decision is supported by substantial evidence, the court "must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Act." *Moran*, 569 F.3d at 112 (alterations omitted) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)); *see also Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). The ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to give

the treating physician's opinion.[14] *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. March 22, 2013 (remanding for failure to develop the record); *Hinds v. Barnhart*, No. 03-CV-6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18, 2005) ("The requirement that an ALJ clarify a treating source's opinion that a claimant is unable to work is part of the ALJ's affirmative obligation to develop a claimant's medical history."); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))). "Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is 'all the more important.'" *Rocchio v. Astrue*, No. 08-CV-3796, 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (citation omitted), *report and recommendation adopted*, No. 08-CV-3796, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). An ALJ's "failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) (citing *Moran*, 569 F.3d at 114–15), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).

---

[14] The ALJ is "under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order).

## 1. Dr. Faridi's Opinion

Plaintiff argues that Dr. Faridi's opinion should have received significant weight because of "the length of the treating relationship and the frequency of examination and [based] upon the nature and the extent of the treatment relationship. He had been treating [Plaintiff] since 2008. The treatment record contained 18 visits between February 2008 and January 2010. He was the primary care physician for [Plaintiff] and was directly involved in her treatment." (Pl. Cross Mot. 15–16.) The ALJ acknowledged that Dr. Faridi was "a treating source with an appropriate area of expertise." (R. at 32.) However, the ALJ accorded Dr. Faridi's opinion little weight because she found it "unsupported by any clinical findings, and inconsistent with the evidence as a whole." (*Id.*) The ALJ specifically noted that while Dr. Faridi diagnosed Plaintiff with "bulging disc and central stenosis," that "the February, 2008 MRI of the lumbar spine showed only a moderate diffuse disc bulge . . . mild central canal stenosis. . . and only a small bilobed disc bulge . . . without neural foraminal narrowing or central canal stenosis." (*Id*. at 32–33.) She also noted that the cervical spine MRI from February 2008 was normal. (*Id.* at 33.) The ALJ found that "Dr. Faridi's opinions of [Plaintiff's] limitations in reaching, handling, fingering, feeling, repetitive simple grasping, and repetitive pushing/pulling are simply unsupported by any clinical evidence." (*Id.*)

Plaintiff highlights the few areas where Dr. Faridi's opinion was consistent with other doctors. (Pl. Cross. Mot. 16.) For example, Dr. Faridi and Dr. Tranese both found that Plaintiff suffered lower back pain, was limited in lifting, standing for long periods and walking for long distances. (*Id.*) Plaintiff also asserts that both Dr. Karlinsky-Bellini and Dr. Faridi found that Plaintiff was limited in the use of her hands and limited in sitting. (*Id.*) However, Dr. Faridi was the only doctor who found that Plaintiff must lie down during the day, and he was the only

doctor who suggested that Plaintiff might not be able to sit for a substantial part of the day. (R. at 272–73.) All of the other sources found that Plaintiff would be able to perform at least sedentary work and no other source found that Plaintiff needed to lie down during the day. (*Id*. at 159, 191, 368–70, 489–93.)

"[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also Newsome v. Astrue*, 817 F. Supp. 2d 111, 125 (E.D.N.Y. 2011) (quoting *Clark*, 143 F.3d at 118). Since the ALJ identified Dr. Faridi as a treating source, engaged in treating physician analysis and found conflicting evidence in the record, the ALJ did not commit legal error when deciding not to give Dr. Faridi's opinion significant weight. *See Prince v. Astrue*, No. 12-CV-2198, 2013 WL 978801, at *2 (2d Cir. Mar. 14, 2013) (summary order) (finding that the ALJ did not commit an error when the ALJ declined to give the treating physician controlling weight because an "ALJ is not required to accept the opinion of a treating physician over other contrary opinions, if the latter are more consistent with the weight of the evidence"); *Brogan-Dawley v. Astrue*, 484 F. App'x 632, 634 (2d Cir. 2012) (summary order) (treating physician's opinions need not be given controlling weight when they contradict other evidence in the record and the ALJ considered them and "provide[d] good reasons for discounting them" (alteration in original) (citations omitted)); *Petrie*, 412 F. App'x at 405–06 (noting that treating source opinions need not be given significant weight when they "were contradicted by those of several medical experts"); *Halloran*, 362 F.3d at 32 (declining to give the treating physicians opinions controlling weight when they "were not particularly informative and were not consistent with those of several other medical experts").

### 2. Dr. Galal's and LMSW Mentovia's Opinion

Plaintiff argues that the ALJ erred by assigning little weight to the treating source psychiatric RFC questionnaire from Dr. Galal and Mentovia. "Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." *Roman v. Astrue*, No. 10-CV-3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) (quoting *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010)). Moreover, the opinion of a treating psychotherapist cannot be given the same weight as the opinion of a consultative examiner. *See Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.' This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" (citations omitted)); *Fofana v. Astrue*, No. 10-CV-0071, 2011 WL 4987649, at *20 (S.D.N.Y. Aug. 9, 2011) ("[I]t is true that the opinion of a consultative physician 'should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist' . . . ." (citations omitted)), *report and recommendation adopted*, No. 10-CV-71, 2011 WL 5022817 (S.D.N.Y. Oct. 19, 2011); *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) ("Generally, the opinion of a consultative physician, who only examined plaintiff once, should not be accorded the same weight as the opinion of plaintiff's treating psychotherapist.").

The ALJ gave Plaintiff's treating sources' psychological RFC questionnaire less weight because it was signed by Mentovia who was a "licensed social worker rather than a medical doctor. . . ." (R. at 33.) However, the ALJ was informed prior to the decision that a psychiatrist

had also been involved in Plaintiff's treatment and would certify the questionnaire. (*See id*. at 70, 468.) Dr. Galal did so on June 3, 2010, and the questionnaire was resubmitted two months prior to the ALJ's decision.[15] (*See id.* at 495, 519.)

Defendant presents two arguments in support of its position that the ALJ's failure to acknowledge Dr. Galal as a treating physician was not legal error. First, Defendant argues that Dr. Galal only had a few visits with Plaintiff beginning February 2010.[16] (Def. Opp'n to Pl. Cross Mot. 6.) Defendant also argues that the ALJ used the proper test to discount the questionnaire and that substantial evidence in the record did not support the findings in the questionnaire. (*Id.* at 7.) As an initial matter, the Court cannot state how the ALJ would have considered the RFC questionnaire if it had been properly accredited to Dr. Galal. It is improper for the Court to speculate how the ALJ would have treated Dr. Galal's opinion because "[a] court must not engage in a *post hoc* effort to supplement the reasoning of the ALJ." *McKinstry v. Astrue*, No. 10-CV-319, 2012 WL 619112, at *4 (D. Vt. Feb. 23, 2012), *aff'd*, No. 12-CV-1702,

---

[15] Even if a doctor did not write the report, if the doctor signs the report, it should be treated as a treating source under the treating physician rule, unless there is evidence that the report does not reflect the doctor's views. *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 628 (S.D.N.Y. 2006); *see also McAninch v. Astrue*, No. 09-CV-0969, 2011 WL 4744411, at *15 (W.D.N.Y. Oct. 6, 2011) ("There is no legal principle which states that a doctor must personally write out a report that he or she signs in order for it to be accorded controlling weight."); *Ford v. Astrue*, No. 09-CV-6280, 2010 WL 4365836, at *13 n.14 (W.D.N.Y. Nov. 3, 2010) ("This Court has previously held that it was error for an ALJ to reject a report by a non-physician that is signed by a treating physician."); *cf. Waters v. Astrue*, No. 10-CV-110, 2011 WL 1884002, at *8 n.5 (D. Vt. May 17, 2011) ("Cases have held that when a doctor and a physician's assistant sign the same reports, 'the opinions [are] those of [the treating physician] as well as those of [the physician's assistant.].'" (alteration in original) (quoting *Riechl v. Barnhart*, 2003 WL 21730126, at *11 (W.D.N.Y. June 3, 2003))).

[16] Defendant also argues that the "records do not reflect that Plaintiff was ever seen by Mentovia, a social worker," despite Mentovia's questionnaire that she had been Plaintiff's treating therapist at Woodside Clinic since January 26, 2010. (Def. Opp'n to Pl. Cross Mot. 6.)

2013 WL 535801 (2d Cir. Feb. 14, 2013). The Court's role is to decide whether the ALJ's failure to consider the opinion of Dr. Galal was harmless error.[17] *Id.*

Defendant argues that Dr. Galal did not have a sufficiently established relationship with Plaintiff to warrant a finding that his opinion deserved significant weight. This argument is contradicted by the record. Dr. Galal appears to have been the treating psychiatrist when Plaintiff was readmitted to the Woodside Clinic program on January 26, 2010.[18] (*See* R. at 146, 150, 216, 251, 255–59, 510.) Dr. Galal's name appears on a "Mental Status Exam" dated February 25, 2010.[19] (*Id*. at 221–26.) According to Plaintiff's Treatment Plan, Dr. Galal saw Plaintiff monthly to review her medications, which means that, at a minimum, he saw Plaintiff four to five times prior to the signing of the report. (*Id*. at 164, 228.) A doctor who has treated and evaluated the patient only a few times may be considered a treating source if "the nature and frequency of the treatment or evaluation" is typical of a patient's condition. 20 C.F.R. § 404.1502; *Lacy v. Astrue*, No. 11-CV-4600, 2013 WL 1092145, at *13 (E.D.N.Y. Mar. 15,

---

[17] "Failure to address evidence is harmless error if consideration of the evidence would not have changed the ALJ's ultimate conclusion." *McKinstry v. Astrue*, No. 10-CV-319, 2012 WL 619112, at *4 (D. Vt. Feb. 23, 2012), *aff'd*, No. 12-CV-1702, 2013 WL 535801 (2d Cir. Feb. 14, 2013); *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (holding that it was harmless error where there was "no reasonable likelihood that [the ALJ's] consideration of the same doctor's 2002 report would have changed the ALJ's determination that [the plaintiff] was not disabled during the closed period").

[18] According to the record, Plaintiff was seen by a Dr. Partyka prior to being seen by Dr. Galal. (*See* R. at 146, 150, 216, 251, 255–59, 510.)

[19] It is unclear from the record if this is the first time Dr. Galal saw Plaintiff. This is arguably a failure on the part of the ALJ to perform her duty to develop the record. *Rivera v. Astrue*, No. 06-CV-3326, 2009 WL 705756, at *7 (E.D.N.Y. Mar. 16, 2009) (holding that an ALJ has a duty to develop the record and the reasons for a treating psychotherapist's opinions); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").

2013). Plaintiff's and Dr. Galal's monthly meetings from February 2010 through June 2010 were sufficient for Dr. Galal to be considered a treating physician. *Avila v. Astrue*, No. 11-CV-9048, 2013 WL 1241925, at *12 (S.D.N.Y. Mar. 28, 2013) (holding that "psychiatrist whom the plaintiff had seen on at least three occasions" was a treating physician); *Newsome*, 817 F. Supp. 2d at 129 (meeting with the plaintiff four times was sufficient to be considered a treating physician).

Defendant's argument that the ALJ engaged in the substance of the treating physician rule is also unavailing. The ALJ discounted Dr. Galal's and Mentovia's RFC questionnaire in part because (1) the RFC questionnaire "did not provide an explanation of how [Plaintiff's] listed symptoms did, in fact," limit Plaintiff in various areas, (2) the RFC questionnaire had failed to provide any clinical studies to support some of the limitations listed, and (3) the RFC questionnaire listed limitations were "based solely on claimant's own belief." (R. at 34.) If the ALJ found that information was lacking in the report, she was under an obligation to develop the record. *Rivera v. Astrue*, No. 06-CV-3326, 2009 WL 705756, at *7 (E.D.N.Y. Mar. 16, 2009) (holding that an ALJ has a duty to develop the record and the reasons for a treating psychotherapist's opinions); *see also Burgess*, 537 F.3d at 129; *Hinds*, 2005 WL 1342766, at *10; *Pabon*, 273 F. Supp. 2d at 514. In addition, it is acceptable to rely on self-reported symptoms when diagnosing mental impairments. *Polis v. Astrue*, No. 09-CV-379, 2010 WL 2772505, at *10 (E.D.N.Y. July 13, 2010) ("Mental impairments are difficult to diagnose . . . [and] 'a patient's report of complaints, or history, is an essential diagnostic tool.'" (quoting *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003))); *see also Burgess*, 537 F.3d at 128 ("'[M]edically acceptable clinical and laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'"

(alteration in original) (quoting *Green–Younger*, 335 F.3d at 107)); *Santana v. Astrue*, No. 12-CV-0815, 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013) ("It is axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder. In fact, whether dealing with mental health or not, consideration of a 'patient's report of complaints, or history, [a]s an essential diagnostic tool,' is a medically acceptable clinical and laboratory diagnostic technique." (alteration in original) (quoting *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182 (E.D.N.Y. 2011))); *Newsome*, 817 F. Supp. 2d at 128 (holding that the ALJ's opinion was "legal error and [was] not supported by substantial evidence" where the ALJ discounted a treating physician's opinion for not being based on laboratory results for an impairment that is not necessarily diagnosed through laboratory results).

The ALJ was under an obligation to develop the record, establish the relationship between Plaintiff and Dr. Galal, fill in any gaps missing in the record and determine what weight to give Dr. Galal's opinion. The ALJ's failure to do so is legal error and cause for remand. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (noting that the failure of an ALJ to properly consider a treating physician's report because the ALJ erroneously found the report to be "incomplete and unsigned" is cause for remand); *Halloran*, 362 F.3d at 33 ("We do not hesitate to . . . and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Collins*, 2013 WL 1193067, at *9–10 (remanding for failure to develop the record); *Zentack v. Astrue*, No. 10-CV-1526, 2012 WL 4364516, at *9 (E.D.N.Y. Sept. 21, 2012) (finding that the ALJ violated the treating physician rule where "there [wa]s no indication that the ALJ considered the length and frequency of [the treating physician's] evaluations of [the plaintiff] over time or the nature and extent of her relationship with [the plaintiff]"); *Santiago v. Astrue*, No. 11-CV-

6873, 2012 WL 1899797, at *19 (S.D.N.Y. May 24, 2012) ("Before rejecting [the treating physician's] findings as inconsistent, [the ALJ] was required to develop the record and 'seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion.'" (citations omitted)).  It was legal error for the ALJ not to develop the record and analyze Dr. Galal's opinion under the treating physician rule and the case must be remanded because of this failure.

### ii.  Credibility Determination

Plaintiff argues that the ALJ erred by making the credibility determination after the RFC determination and using the RFC determination as the tool to determine credibility rather than the substantial evidence in the record.[20]  (Pl. Cross Mot. 19–20; Pl. Reply 4–5.)  Defendant argues in response that while organizationally the credibility determination occurred after the RFC determination, the credibility determination was based on substantial evidence in the record.  (Def. Opp'n to Pl. Cross Mot. 7–9.)  "Generally speaking, it is the function of the ALJ, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.'"  *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d Cir. 2010) (summary order); *see also Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) (summary order) ("It is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."

---

[20]  As an initial matter, Plaintiff's objection to the fact that the ALJ may have used the RFC determination as a reference point is without merit.  The Second Circuit has upheld credibility determinations where the RFC determination functioned as a reference point. *See, e.g., Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order) (upholding the ALJ's finding that the plaintiff's "subjective assessment of the intensity and persistence of his symptoms was not credible 'to the extent [it was] inconsistent with the [light work] residual functional capacity assessment'" (alteration in original) (citations omitted)).

(alteration in original) (quoting *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984))).

"In making a credibility determination, the ALJ must consider all of the evidence before him, including the claimant's testimony itself." *Salmini*, 371 F. App'x at 113. In making a credibility determination, the ALJ "[f]irst, '. . . must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.'" *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (quoting *Genier*, 606 F.3d at 49). "If so, the ALJ must then consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Campbell*, 465 F. App'x at 7 (alteration in original) (quoting *Genier*, 606 F.3d at 49). In the second stage, the ALJ must first consider all of the available medical evidence, including Plaintiff's statements, treating physician's reports, and other medical professional reports. *Whipple v. Astrue*, 479 F. App'x 367, 370–71 (2d Cir. 2012) (summary order). The ALJ must then weigh Plaintiff's statements "against the objective evidence, including medical records, of his symptoms." *Whipple*, 479 F. App'x at 370–71. An ALJ may find a plaintiff not to be credible if medical evidence as a whole contradicts his or her statements. *Whipple*, 479 F. App'x at 370–71.

### 1. Physical Impairments

The ALJ properly engaged in various stages of analysis in evaluating Plaintiff's physical impairment and complaint of pain. The ALJ performed a thorough analysis of various documents in the record and found that they did not support the intensity of Plaintiff's physical impairments as reported by Plaintiff. (R. at 30.) Because the ALJ thoroughly compared Plaintiff's assertions with the evidence in the record, her credibility finding as to Plaintiff's

physical impairments requires deference. *See, e.g., Whipple*, 479 F. App'x at 370–71 (upholding ALJ's credibility determination when it was based on substantial evidence in the record); *Campbell*, 465 F. App'x at 7 (same); *Carvey v. Astrue*, 380 F. App'x 50, 53–54 (2d Cir. 2010) (same).

### 2. Mental Impairments

By failing to adequately develop the record before evaluating Plaintiff's mental impairments, the ALJ failed to properly assess Plaintiff's credibility. *See, e.g.*, *Genier*, 606 F.3d at 50 (holding that the ALJ's credibility determination will not be upheld when it is based on an erroneous understanding of the record); *Daniel v. Astrue*, No. 10-CV-5397, 2012 WL 3537019, at *11 (E.D.N.Y. Aug. 14, 2012) ("The ALJ's determination that [the plaintiff']s allegations were inconsistent with the medical evidence was tainted by the ALJ's failure to properly evaluate the opinions of [the plaintiff]'s treating physicians — a failure that would naturally have affected how the ALJ viewed the totality of the medical evidence." (alterations in original) (citations omitted)); *Calzada*, 753 F. Supp. 2d at 281 (holding that the ALJ's credibility determination "is inherently flawed" when the ALJ fails to adequately develop the record). Therefore, this matter is remanded for further development. The ALJ should consider Plaintiff's subjective complaints after developing and evaluating Dr. Galal's opinion. *See, e.g.*, *Daniel*, 2012 WL 3537019, at *11.

### iii. RFC Determination

Plaintiff alleges that the ALJ's RFC determination was not supported by substantial evidence in the record. (Pl. Cross Mot. 20.) Defendant argues that the RFC determination was based on substantial evidence in the record since it was based on all relevant evidence in the record. (Def. Opp'n to Pl. Cross Mot. 9.) In determining the RFC, "[t]he Commissioner must

consider objective medical evidence, opinions of examining or treating physicians, subjective

evidence submitted by the claimant, as well as the claimant's background, such as age,

education, or work history." *Stover*, 2012 WL 2377090, at *6 (citing *Mongeur*, 722 F.2d at

1037).

### 1. Physical Impairments

The ALJ's RFC determination as to Plaintiff's physical impairments reflects the record of

Plaintiff's physical impairments. The ALJ's findings of Plaintiff's physical capacities are

consistent with the findings of Dr. Tranese, Dr. Karlinsky-Bellini and Dr. Sikder, and they are

also consistent with the RFC assessment.

### 2. Mental Impairments

In considering Plaintiff's mental impairments, the ALJ failed to consider the fact that

Plaintiff (a) had consistently demonstrated signs of depression, (b) had been on medication for

years to treat depression, and (c) had been going to therapy weekly and had her medications

adjusted monthly. This failure is cause for remand. *See, e.g., Parker-Grose v. Astrue*, 462 F.

App'x 16, 17–18 (2d Cir. 2012) (summary order) (holding that the ALJ had failed to adequately

consider the totality of the plaintiff's medical records including the fact that plaintiff was

diagnosed with a GAF of 55 which means the plaintiff was moderately limited in work);

*Rodriguez v. Astrue*, No. 11-CV-7720, 2012 WL 4477244, at *39 (S.D.N.Y. Sept. 28, 2012)

("The ALJ failed to consider the full extent of plaintiff's mental problems, ignoring years of

complaints and diagnoses of depression and anxiety, which he referred to as 'relatively benign

clinical findings.' On remand, the ALJ should consider the full scope of the evidence of

plaintiff's disability, including that tending to support a conclusion of disability." (citations

omitted)). Furthermore, the ALJ failed to adequately develop the record pertaining to Plaintiff's

mental capabilities and, therefore, could not make an accurate assessment. *Rodriguez*, 2012 WL 4477244, at *39 (noting that the ALJ failed to properly consider the plaintiff's treating psychiatrist opinion which affected the RFC determination); *Robinson v. Astrue*, No. 08-CV-4747, 2009 WL 4722256, at *3 (E.D.N.Y. Dec. 9, 2009) (holding that the RFC determination was flawed where the ALJ failed to adequately develop the record in regard to the "plaintiff's psychological condition" and that the case must be remanded). This matter is remanded on the issue of Plaintiff's mental impairments RFC determination.

## III. Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings is denied. Plaintiff's cross motion for judgment on the pleadings is granted. The Court finds that the ALJ committed legal error when she failed to fulfill her affirmative duty to develop the record before determining the weight to give the opinion of Plaintiff's treating psychiatrist Dr. Galal. The ALJ also failed to properly assess Plaintiff's credibility in determining her mental impairment and to properly account for Plaintiff's mental impairment in the RFC determination. The Commissioner's decision is reversed and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.


SO ORDERED:


_____
        s/MKB
MARGO K. BRODIE
United States District Judge


Dated: July 30, 2013
        Brooklyn, New York